UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

REALNETWORKS, INC.,

          Plaintiff(s),

    v.

QSA TOOLWORKS, LLC,

          Defendant(s).

NO. C07-1959MJP

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT

The above-entitled Court, having received and reviewed

1.    Defendant QSA ToolWorks LLC's Motion for Partial Summary Judgment (Dkt. No. 64)

2.    Plaintiff RealNetworks, Inc.'s Opposition to Defendant QSA ToolWorks LLC's Motion for

     Partial Summary Judgment (Dkt. No. 79)

3.    Plaintiff RealNetworks, Inc.'s Motion for Summary Judgment (Dkt. No. 71)

4.    Defendant QSA ToolWorks LLC's Response to Plaintiff RealNetworks, Inc.'s Motion for

     Summary Judgment (Dkt. No. 81)

and all attached declarations and exhibits, makes the following ruling:

     IT IS ORDERED that Plaintiff's motion for summary judgment on the issue of "likelihood of

confusion" is GRANTED; the Court finds as a matter of law that there is no likelihood of confusion

between the "Helix" products created by RealNetworks, Inc. and QSA ToolWorks, LLC.

     IT IS FURTHER ORDERED that Defendant's motion for summary judgment on the issue of

the nature of the Consent Agreement is GRANTED; the Court finds that the Consent Agreement

between RealNetworks, Inc. and The Chip Merchant ("TCM") was executory in nature and is deemed

rejected by the trustee in the bankruptcy of TCM.  The Court makes no finding on the legal

consequences of that rejection.

**ORD ON CROSS-MTNS
 FOR SUMM JMT - 1**

1    IT IS FURTHER ORDERED that summary judgment for either party on the remaining issues

2    is DENIED.

3    **Background**

4    In 1985, a man named Brian Turner formed a hardware corporation called The Chip Merchant

5    ("TCM").  TCM purchased, in 1997, the assets (software code, customer lists, trademarks, copyright,

6    good will) for a relational database technology known as "Helix."  TCM registered, in its name,

7    trademarks for HELIX and HELIX RADE.  In December of 2000, TCM created a wholly-owned

8    subsidiary, Helix Software Technologies ("HST").

9    On January 1, 2001, a document entitled "Bill of Sale and General Assignment" was executed

10   between TCM and HST (Brian Turner, in his capacity as president of both companies, was the sole

11   signatory).  The document stated that TCM was assigning to HST "[a]ll trade names, trade styles,

12   trademarks. . . and all U.S., federal, state, foreign and other registrations and applications thereof in all

13   classes."  Exh. 7, ¶ 1(e), Declaration of Tranckino.  Although dated January 1, 2001, the Bill of Sale

14   and General Assignment was not filed with the Patent and Trade Office ("PTO") until April 1, 2009.

15   HST never registered the "Helix" marks in its name.

16   In late June and early July of 2002, Plaintiff RealNetworks, Inc. ("RN") entered into a Consent

17   Agreement (the "Agreement") with TCM regarding co-extensive use of the "Helix" mark.  The

18   Agreement warrants that TCM owns "all right, title and interest in the TCM Marks" (Declaration of

19   Engel, Exh. 11, ¶ 5),  which are defined in that document as "several United States registrations and

20   pending applications for trademarks including the word 'HELIX' for some or all of the TCM Goods

21   and Services."  Id., ¶ A.   Further, the Agreement purports to bind "assigns, affiliates, related

22   companies and licensees of each party..." Id., ¶ 6.  On July 18, 2002, RN filed applications to register

23   "Helix" and "Helix (and Design)" as trademarks with the PTO.  That same month, RN began releasing

24   a digital media software platform under the name "RN Helix."

25

26   **ORD ON CROSS-MTNS**
      **FOR SUMM JMT - 2**

In April of 2003, TCM filed for bankruptcy under Chapter 11 of the Bankruptcy Code; the filing was later converted to a Chapter 7 proceeding.  TCM represented in their Schedule B/Personal Property declaration pursuant to that filing that it owned no patents, copyrights and other intellectual property.  The following year, the bankruptcy trustee sold to Defendant QSA ToolWorks LLC ("QSA") TCM's stock in HST (the exact nature of this transaction is disputed among the parties).

In September of 2005, RN's intent-to-use application for the "Helix" marks was published for opposition.   The following year, QSA filed its opposition to RN's application before the U.S. Trademark Trial and Appeal Board, and also assigned itself the registered "Helix" trademarks on the basis of its purchase of HST stock from the bankruptcy trustee.

On December 6, 2007, RN filed a declaratory judgment action with this Court, seeking a judicial determination that:

1.    QSA has no rights in the TCM "Helix" marks and/or its rights, if any, originate from the company's inception in 2004;

2.    If QSA has rights in the TCM "Helix" marks, it is bound by the Consent Agreement and has breached its obligations under that Agreement;

3.    QSA's "Helix" trademark application (Ser. No. 78779957) should be cancelled;

4.    There is no likelihood of confusion between RN's and QSA's use of "Helix" for their respective goods and services;

5.    RN is entitled to damages, costs and fees.

Defendant QSA has answered and counterclaimed, seeking relief in the form of a declaration that:

1.    QSA is not bound by the Consent Agreement;

2.    QSA has rights in the "Helix" marks which are senior to RN's;

ORD ON CROSS-MTNS
 FOR SUMM JMT - 3

3.    RN's pending trademark applications for use of "Helix" should be denied, and QSA's

granted;

4.    RN is liable for reverse trademark infringement and unfair competition and QSA is

entitled to damages thereby.

**Discussion**

I.  Summary judgment standard

Summary judgment is appropriate where the evidence shows that "[t]here is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56.  To satisfy its burden on summary judgment, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Isn. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party meets its initial burden, the nonmoving party must come forth with specific facts to show that a genuine issue of material fact exists.  FRCP 56(e)(2).  The nonmoving party may not rely on conclusory allegations unsupported by factual data to create an issue of material fact.  Id.; *see also*, Delange v. Dutra Contr. Co., Inc., 183 F.3d 916, 921 (9th Cir. 1999) (conclusory allegations insufficient to withstand summary judgment).

II.  Likelihood of confusion

We must analyze the parties' claims on this issue using the Sleekcraft factors.  *See* AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).  The test does not establish a black-and-white standard, nor is it simply a matter of adding up factors on each side and seeing which party has more – the Court weighs each factor individually, ascribes significance to each factor independently and looks to the totality of the circumstances before coming to a determination.  Id. at 348.  See also

**ORD ON CROSS-MTNS
 FOR SUMM JMT - 4**

1    Eclipse Associates, Ltd. v. Data General Corp., 894 F2d 1114, 1118 (9th Cir. 1990).  The Court

2    analyzes the Sleekcraft factors as follows:

3        A.  Strength of the mark

4        RN asserts (and QSA does not challenge) that both parties' Helix marks are "fanciful" and

5    therefore entitled to the highest level of trademark protection.  Moose Creek, Inc. v. Abercrombie &

6    Fitch Co., 331 F.Supp.2d 1214, 1222 (C.D.Cal., 2004).  Even strong, fanciful marks can be weakened

7    by registration and usage by third parties, however.  Matrix Motor Co., Inc. v. Toyota Jidosha

8    Kabushiki Kaisha, 290 F.Supp.2d 1083, 1091(C.D.Cal., 2003).  Plaintiff provides evidence of 57

9    "live" applications for products using only "Helix" in the mark (Decl. of Engel, Exh. 28), and 9

10   instances of "Helix" marks on record with software businesses.  Id., Exh. 29.  This weakens the

11   strength of the "Helix" mark somewhat.[1]

12       Conversely, QSA concedes that RN's Helix mark is "relatively strong," and that RN's Helix

13   mark, as a result of the millions expended on marketing and promotion, "has acquired great

14   commercial strength as a mark."  Def. Response, p. 7.  The Court is aware that QSA makes this

15   concession for purposes of establishing "reverse confusion" (which requires proof that a strong junior

16   mark is "swamping" a senior mark), but as discussed in detail infra, the Court finds that Defendant has

17   not succeeded in establishing that they are entitled to a favorable ruling on the issue of "seniority of

18   mark" on summary judgment.

19       The Court finds that RN has the stronger mark between these two parties.

20   _____

21       [1]  "Use of similar marks by third-party companies in the relevant industry weakens the mark at issue. See Miss
     World (UK) Ltd. v. Mrs. America Pageants, Inc., 856 F.2d 1445, 1449 (9th Cir.1988); see also Eclipse Assocs. Ltd. v.
22   Data Gen. Corp., 894 F.2d 1114, 1119 (9th Cir.1990) ('Evidence of other unrelated potential infringers is irrelevant to
     claims of trademark infringement and unfair competition under federal law.' (emphasis added))."  M2 Software, Inc.v.
23   Madacy Entertainment, 421 F.3d 1073, 1088 (C.A.9 (Cal.),2005).  The Court bases this portion of its finding on the 9
     uses of the "Helix" mark in the software industry.

24

25

26   **ORD ON CROSS-MTNS**
      **FOR SUMM JMT - 5**

1    B. Proximity of goods

2    The parties spend a good deal of time arguing whether their products perform "similar" or

3    "identical" functions.  RN argues that the "streaming media" functions of its Helix software are

4    entirely distinct from the "relational database management" functions of QSA's Helix applications;

5    QSA argues that its product is used in streaming media configurations, that its Helix products have

6    expanded beyond relational database management, and that RN's Helix products have expanded

7    beyond simple streaming media uses.

8    But the Sleekcraft opinion does not refer to "identical" or even "similar" uses.  The Sleekcraft

9    court addressed this concern to whether the products are "related" or "complementary," observing

10   that "[f]or related goods, the danger presented is that the public will mistakenly assume there is an

11   association between the producers of the related goods, though no such association exists. . . Although

12   these product lines are non-competing, they are extremely close in use and function."  599 F.2d at 349.

13   The Court finds the Ninth Circuit's ruling in M2 Software, Inc.v. Madacy Entertainment, 421 F.3d

14   1073 (C.A.9 (Cal.), 2005) instructive.  In a trademark case where the litigants both distributed

15   identical products (music and CDs) under the same name, the court found that            "[t]herefore

16   this [proximity] factor weighs in M2 Software's favor, *but only slightly* because the genres of the

17   music CDs are very significantly different."  Id. at 1081 (emphasis supplied).  If the Ninth Circuit was

18   willing to find only a "slight" proximity factor between two manufacturers of a generically-identical

19   product (CDs, downloadable music), this Court has little difficulty finding in RN's favor on this factor.

20   When fundamental functionality is distinct, the case supports a finding of "no confusion."

21   Instant Media, Inc. v. Microsoft, 2007 WL 2318948 *12 (citing M2 Software).  QSA's Helix software

22   is used for creating applications which manage and modify information in relational databases, such as

23   custom databases for tracking appointments and billing.  Strange Depo. at 208:12-212:15, 287-3-24;

24   Numeroff Depo. at 32:1-34:3, 86:1-11, 167:11-169:4, 268:12-19.  In contrast, RN Helix products are

25

26   **ORD ON CROSS-MTNS**
     **FOR SUMM JMT - 6**

1    utilized for the delivery of streaming media (audio and video), for media encoding and decoding in a

2    variety of formats and "for the related efficient management of content delivery and network

3    bandwidth for streaming over the Internet." RN Mtn., p. 17; Engel Decl., Exh. 5 at 1-2 and 5.

4            Nowhere in QSA's extensive list of current uses of its Helix products (*see* QSA Mtn., p. 23;

5    QSA Response, p. 4) or the associated attachments does the Court find any application which overlaps

6    with the core functionality of RN's streaming media delivery and management software.  Even in those

7    instances where QSA's application is used in *conjunction* with other media-related programs (such as

8    Apple's QuickTime) – which Defendant describes as "multimedia content serving" (id. at p. 5) – it is

9    apparent that QSA's products require utilization of a third-party application before they can function

10   in any capacity remotely resembling RN's products.[2]  One of QSA's own experts agreed that QSA's

11   Helix products cannot stream media without "something else" and further testified that, if he wanted to

12   stream live video to thousands of users simultaneously, he would not use QSA's Helix server to

13   accomplish that task.  Atkins Depo., 92:20-93:3, 99:15-20.

14           Defendant's claim that it has been involved in "multimedia content serving. . . since at least

15   1991" (QSA Resp., p. 5) is undercut by the analysis above regarding the indirect nature of this

16   involvement, and by the fact that QSA provided no evidence that it had produced or marketed

17   (currently or in the past) a product with <u>direct</u> streaming media functionality.  That it may have

18   contemplated doing so at one point or may yet do so in the future is not a consideration relevant to

19   this litigation.  A party may not allege trademark protection or confusion based on its *potential* to

20   develop a competing product.  <u>Aycock Engineering, Inc. v. Airflite, Inc.</u>, 560 F.3d 1350, 1360 (Fed.

21   Cir. 2009).

22

23   _____

24       [2] QSA attempts to demonstrate that RN also relies on third-party technology to encode and decode media (*see*
     Def. Supp. Exh's 54 & 55), but the Court is not persuaded.  Defendant's supplemental exhibits only serve to show that
     RN products, in addition to their stand-alone media streaming capability, can also function compatibly with other
25   streaming media formats such as QuickTime.

26   **ORD ON CROSS-MTNS**
     **FOR SUMM JMT - 7**

1    Defendant has also stressed that it need not prove that its Helix products compete directly with

2    RN's in order to establish "proximity" and thus confusion; that the "core question" is "whether

3    confusion is likely as to *source* or *sponsorship* of the products and services."  Def Mtn., p. 20, citing

4    Halicki Films v. Sanderson Sales and Marketing, 547 F.3d 1213, 1228 (9th Cir. 2008) and

5    Perfumebay.com, Inc., v. Ebay, Inc., 506 F.3d 1165, 1173 (9th Cir. 2006)(emphasis in original).

6    Although neither the Court nor Plaintiff disputes this contention, it avails Defendant little.  As is

7    discussed more fully in the "purchaser care" analysis *infra*, the Court finds that the sophisticated

8    consumers who utilize these highly technical software products and understand the difference between

9    "relational database" and "streaming media" applications will be as unlikely to confuse the source of

10    these products as they would be to confuse their functionality.

11    The Court finds in favor of RN as a matter of law concerning the factor of "proximity of

12    goods."

13    C.  Similarity of marks

14    RN does not discuss this factor at all, while QSA merely asserts "the identical word portion of

15    the HELIX mark" (i.e., same word in both marks) and the "close similarity of the design portion,"

16    without citation to any proof in the record.  Def. Mtn., p. 20.  The Court finds that neither party has

17    made a case for summary judgment regarding this factor.

18    D.  Evidence of actual confusion

19    As the Sleekcraft court observed, "[p]roving actual confusion is difficult. . . and the courts

20    have often discounted such evidence because it was unclear or insubstantial."  599 F.2d at 352

21    (citations omitted).  The Court finds that this is the case here – QSA's proof of actual confusion is, in

22    the context of the time period (7+ years) and number of users/customers of all the Helix products,[3]

23

24    [3]  RN and QSA both allege that RN's HELIX software distributed to 175 - 180+ million users. Way Decl., ¶ 4;

25    Answer, ¶ 68.

26    **ORD ON CROSS-MTNS**
 **FOR SUMM JMT - 8**

"insubstantial." Most of QSA's allegations regarding "actual confusion" are anecdotal and hearsay and very little was kept in the way of records. *See* Def Mtn., p. 22. "There is no absolute scale as to how many instances of actual confusion establish the existence of that factor. Rather, the court must evaluate the evidence of actual confusion in the light of the totality of the circumstances involved." AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1543 (11th Cir. 1987). In light of the totality of the circumstances of this litigation, the Court does not find Defendant's proof regarding "actual confusion" to entitle QSA to summary judgment on this issue.

Furthermore, the Court is persuaded that the existence of the Agreement constitutes proof of lack of actual confusion, since the users of the two marks were able to reach consensus regarding their differentiated use of the name. See Application of E.I. DuPont DeNemours & Co., 476 F.2d 1357, 1363 (Cust. & Pat. App. 1973).[4]

E. Marketing channels

RN's assertion that "neither [party] shares a marketplace where both products are offered at the same time (such as on a reseller like Amazon)" (Plaintiff Mtn., p. 23)[5] is essentially unchallenged by QSA. The Court does not find Defendant's unsupported assertion that both parties utilize "Web-focused channels of trade" (Def Mtn., p. 20) to be persuasive on this element – the fact that both products are available *somewhere* on the internet does not represent an overlap of marketing channels for purposes of the Sleekcraft analysis. The Court finds in favor of RN on this factor.

---

[4] The Court makes no finding at this time regarding the issue of whether TCM actually *owned* the rights to the "Helix" marks at the time the Agreement was entered into. Rather, the observation regarding the relevance of the Agreement to the issue of actual confusion is based on Brian Turner's dual role as president of TCM and HST. In that capacity, the implied representation that there was no confusion between the two marks may be attributed to both companies.

[5] RN produces deposition testimony from two QSA principals that QSA does no paid marketing, depending solely on its website to promote its products. Exh. 1, Numeroff Depo., 13:11-17; Exh. 6, Strange Depo., 301:13-302:14.

1    F.  Type of goods and purchaser care

2    "Type of goods" simply refers to high quality versus low quality – neither party argues that

3    either product is anything other than a high quality software application.  This leaves only the issue of

4    "purchaser care" to be decided concerning this factor.

5    Regarding the issue of the care exercised by purchasers, "the standard used by the courts is the

6    typical buyer exercising ordinary caution."  Sleekcraft, 599 F.2d at 353.  The more sophisticated the

7    buyer, the less likelihood of confusion.  Instant Media, Inc. v. Microsoft, 2007 WL 2318948, *16

8    (N.D.Cal. 2007).  The Court notes the declaration of QSA principal Matthew Strange that "both

9    companies closely and actively sponsor licensed development services targeted toward experienced

10   commercial programmers..." Strange Decl., ¶ 11.  The Court finds that the "typical" or "prudent"

11   consumer of the "Helix" products offered by RN and QSA is an experienced commercial computer

12   programmer/utilizer unlikely to confuse these differing types of applications or their manufacturers.

13   This Sleekcraft factor resolves in RN's favor for purposes of the parties' summary judgment

14   requests.

15   G.  Intent in selecting mark

16   The Court finds RN's argument that the Agreement stands as "strong evidence" of their lack of

17   intent to infringe to be persuasive.  Even assuming arguendo that RN mistakenly contracted with a

18   party who did not have the authority to consent to shared use of the mark, and even if the contract is

19   deemed rejected in bankruptcy as executory, its public nature still speaks strongly of Plaintiff's non-

20   infringing intent.  QSA essentially conceded this element at oral argument, and the Court finds in favor

21   of RN on this factor.

22   H.  Likelihood of expansion

23   "Inasmuch as a trademark owner is afforded greater protection against competing goods, a

24   'strong possibility' that either party may expand his business to compete with the other will weigh in

25

26   **ORD ON CROSS-MTNS**
     **FOR SUMM JMT - 10**

1  favor finding that the present use is infringing." Sleekcraft, 599 F.2d at 354 (quoting Restatement of

2  Torts).

3          In light of the uncertain status of the Consent Agreement (*see* "Executory nature of Consent

4  Agreement" section *infra*), the Court cannot adopt RN's argument that the Agreement acts to confine

5  either party's expansion.  Nevertheless, the Court finds in RN's favor on summary judgment

6  concerning this factor based on a dual rationale: (1) given the dissimilar functionality of their

7  respective applications (streaming media v. relational database management), neither party's use of

8  their Helix products represents a "natural zone of expansion" for the other party (Glow Ind., Inc. v.

9  Lopez, 252 F.Supp.2d 962, 984 (C.D.Cal. 2002), citing Tally-Ho, Inc. v. Coast Comm. College Dist.,

10  889 F.2d 1018, 1028-29 (11th Cir. 1989); and (2) QSA offered no evidence of concrete plans to

11  expand into RN's "direct streaming media" territory.

12

13          With the exception of the "similarity of marks" factor (which is a 'no decision,' as opposed to a

14  finding in QSA's favor), the Court finds as a matter of law that the Sleekcraft factors overwhelming

15  favor Plaintiff's position of "no likelihood of confusion."  On this basis, Plaintiff is entitled to a finding

16  on summary judgment that there is no likelihood of confusion between its use of the Helix mark and

17  that of  QSA.

18  III.    Executory nature of Consent Agreement

19          "An executory contract is one in which a person promises to do or not to do a particular

20  thing..."  Williston on Contracts, § 1:19.  The Ninth Circuit has defined it as

21                  ". . . a contract. . . on which performance is due to some extent on both sides" and in
                    which "the obligations of both parties are so far unperformed that the failure of either
22                  party to complete performance would constitute a material breach and thus excuse the
                    performance of the other."
23

24  Griffel v. Murphy (In re Wegner), 839 F.2d 533, 536 (9th Cir. 1988).

25

26  **ORD ON CROSS-MTNS**
    **FOR SUMM JMT - 11**

1       The issue of whether the Agreement constitutes an executory contract has some significance

2  for the parties in this case, although the exact nature of that significance remains unclear.  The

3  Bankruptcy Code states that

4              In a case under chapter 7, if the trustee does not assume or reject an executory contract
             within 60 days after the order for relief, or within such additional time as the court, for
5              cause, within such 60-day period, fixes, then such contract is deemed rejected.

6  11 U.S.C. §365(d)(1).  There is no dispute that, following the order for relief in TCM's bankruptcy,

7  the trustee neither assumed nor rejected the Agreement.  If it is an executory contract, then the Court

8  must deem it rejected as a matter of law.

9       With the Ninth Circuit definition in mind, the Court finds that the following provisions of the

10  Agreement fall within the meaning of "executory" contractual obligations:

11             "At Real's expense, *TCM shall provide Real with such assistance in the registration of
             such marks as Real may reasonably request. . .*"  (¶ C.2)
12
             "The parties shall *cooperate in good faith to develop measures as necessary to
13              minimize any possible confusion* between their respective use of marks containing the
             term HELIX.  The parties also *agree to cooperate in the policing and enforcement of
14              their respective trademark rights against any third party* adopting a mark likely to be
             confused with either parties' respective HELIX marks." (¶ C.5)
15
   Agreement, Decl. of Engel, Exh. 11 (emphasis supplied).  The agreements to provide assistance in the
16
   future, develop measures to minimize confusion and cooperate in policing and enforcement against
17
   unauthorized third parties all represent "performance due. . . on both sides" and "obligations. . . so far
18
   unperformed" by both parties at the time of execution; i.e., ongoing, unexecuted duties.
19
        RN attempts to characterize the Agreement as a "settlement agreement" and argue by analogy
20
   from other "settlement agreement in bankruptcy" cases that this contract is not executory in nature.
21
   The Court does not find Plaintiff's precedents compelling.  In In re Value Music Concepts, Inc. (55
22
   Collier Bankr. Cas. 2d 756 (Bankr. N.D.Ga. 2005)), an agreement to divide assets and settle matters
23
   was found not be executory because "it did not contemplate any ongoing business relationship and it
24
   had no material unperformed obligations." (RN Mtn., p. 14)  That is not the case here, as RN has
25

26  **ORD ON CROSS-MTNS**
    **FOR SUMM JMT - 12**

1    provided no proof that the ongoing obligations mentioned above – which the Court finds material to

2    the expressed intent of the contracting parties – had been satisfactorily or finally performed.

3        Nor is the Court persuaded by Plaintiff's citation to In re Columbia Gas Systems (50 F.3d 233

4    (3rd Cir. 1995), a case where an undeposited escrow amount and some unexecuted releases were

5    found not to create an executory contract. The "unexecuted" portions of the settlement were time-

6    limited items that were simply unperformed when one of the parties entered bankruptcy – not on all

7    fours with the circumstances before this Court, where the nature of obligations was not time-limited

8    under the language of the Agreement.

9        Plaintiff's final case – California Packing Corp. v. Sun-Maid Raisin Growers of California, 81

10   F.2d 674 (9th Cir. 1936) – seems particularly inapposite. The agreement involved two different

11   trademark names ("Sun-Maid" v. "Sun-Kist") and an agreement to only use the "Sun-Maid" brand for

12   certain kinds of produce. There is no indication that the parties agreed to cooperate, provide each

13   other with assistance or co-develop anything on an ongoing basis, nor does the appellate court even

14   discuss the issue of executory contracts.

15       While the issue of whether the Agreement was an executory contract was thoroughly briefed

16   by both sides, the issue of the legal effect of finding the Agreement to be executory was largely

17   unexplored. Questioned at oral argument, counsel for the parties provided (unsurprisingly) differing

18   opinions on the consequences of a ruling that the Agreement was executory in nature. In view of the

19   absence of legal authority before the Court on this issue, the ruling will be confined to the simple

20   finding that the Agreement is an executory contract as a matter of law, leaving for another day and

21   another round of briefing what effect that finding will have on the role of the Agreement in the dispute

22   between these two parties.[6]

23   ───────────────────

24       [6] The Court will note, however, that it does not find QSA's argument that the Agreement was a "sham" to be
     worthy of a summary judgment finding in Defendant's favor. Many of the factors cited in support of this position –
25   whether RN conducted "due diligence" concerning the ownership of the "Helix" marks, whether RN took adequate

26   **ORD ON CROSS-MTNS**
     **FOR SUMM JMT - 13**

1    IV.  Senior rights to the "Helix" marks

2        At Count One of its Complaint, Plaintiff asks the Court to declare that "QSA has not acquired

3    rights senior to RealNetworks' rights in the Real HELIX Marks in any. . . way."  Complaint, ¶ 25(d).

4    A portion of QSA's counterclaims are based on its assertion that RN's rights to the Helix marks are

5    junior to theirs, by virtue of their purchase of HST stock (and, Defendant claims, assets) from the

6    bankruptcy trustee in 2004.  Answer, Affirmative Defenses and Counterclaims, ¶ 100 and Prayer for

7    Relief, ¶ B.

8        The Court finds that there are genuinely disputed issues of material facts which prevent

9    judgment as a matter of law for either party on this issue.

10        Both parties' claims of senior rights to the "Helix" marks revolve around the questions of (1)

11    whether HST owned the trademark rights to the Helix names and (2) whether the ownership of HST's

12    assets (including their trademark rights) passed to QSA at the time it purchased the HST stock from

13    the bankruptcy trustee.  Granting either sides' request for summary judgment on the issue of seniority

14    would entail a finding that no genuine issues of material fact exist concerning the question of the

15    rightful ownership of the Helix trademarks, which the Court cannot do on the present record.

16        Plaintiff's position (that TCM owned the Helix marks and had the right to contractually bind

17    those marks, and that QSA acquired only HST stock in the bankruptcy sale) is hardly based on

18    undisputed facts.  It is undercut by both the existence of the executed Bill of Sale and General

19    Assignment that purports to transfer all rights in the Helix marks to HST, as well as by TCM's

20    declaration in bankruptcy that it owned "no patent, copyrights, and other intellectual property."

21        Conversely, QSA's position (that they are the owners of the "Helix" marks and trademark

22    registration in an unbroken line stretching back to the creators of the original name and product) is

23

24    measures to avoid confusion, e.g. – involve disputed issues of material fact.  The fact that there was not an ongoing
     dispute between RN and TCM does not make the Agreement a "sham" – the efficacy of *avoiding* disputes by reaching
25    agreements such as the Consent Agreement for co-extensive uses of trademarks is self-evident.

26   **ORD ON CROSS-MTNS**
      **FOR SUMM JMT - 14**

1  plagued by disputed factual issues as well: namely, TCM's claim in the Agreement that it owned the

2  rights to the "Helix" marks and the bankruptcy trustee's repeated assertions that what QSA was

3  purchasing were simply shares in HST, not the assets of the company.  See Decl. of Engel, Exh's 15,

4  18, 19, 21, 22, and 33.[7]

5          Nor is the fact that QSA has recorded ownership of the "Helix" marks particularly significant.

6  Recordation is not conclusive proof of ownership (which Defendant unquestionably knows, since

7  TCM was the recorded owner of the "Helix" marks at the time the Agreement between TCM and RN

8  was executed) and any initial presumption of validity based on that fact is rebuttable.  RN has certainly

9  produced evidence to the contrary.

10          The Court finds that neither side is entitled to summary judgment on this issue of whose rights

11  to the "Helix" marks were senior.

12  **Conclusion**

13          Utilizing the Sleekcraft factors, the Court finds a matter of law that there is no likelihood of

14  confusion regarding the Helix products created and marketed by RealNetworks and those created and

15  marketed by QSA ToolWorks.  Plaintiff's motion for summary judgment on that issue will be granted;

16  Defendant's will be denied.

17          The Court further finds that the Consent Agreement between RealNetworks and The Chip

18  Merchant represented a contract in which "the obligations of both parties are so far unperformed that

19  the failure of either party to complete performance would constitute a material breach and thus excuse

20  the performance of the other" (Griffel, 839 F.2d at 536), and on that basis the agreement is executory

21  in nature and deemed rejected by the bankruptcy trustee during the course of The Chip Merchant's

22

23          [7]  At oral argument, Defendant's counsel provided a plausible explanation for the bankruptcy trustee's position;
      namely, that with commendable caution the trustee was declining to represent that he was transferring anything other
      than what the bankrupt's estate owned, which was shares of HST stock.  HST's assets were not the property of TCM.
24    Regardless of the appeal of counsel's perspective, however, this aspect of the bankruptcy proceedings as they effect the
      current litigation was essentially unbriefed.  The Court is not in a position to make a conclusive finding on this portion
25    of the case, and the factual disputes and their legal effects remain unresolved.

26  **ORD ON CROSS-MTNS**
     **FOR SUMM JMT - 15**

1   bankruptcy.  The Court makes no finding regarding the legal effect of the rejection of the Consent

2   Agreement in bankruptcy.

3        Finally, the Court denies summary judgment to both parties on the issue of whose rights are

4   senior concerning the "Helix" marks.  The existence of genuine issues of material fact prevents

5   judgment as a matter of law for either side.

6

7   Dated:  August _14_, 2009

8

9

    Marsha J. Pechman
10   U.S. District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   **ORD ON CROSS-MTNS
     FOR SUMM JMT - 16**